STEPHENS, Judge.
*641 Plaintiff Glenn Wells ("Wells"), a Wilmington resident and taxpayer, and Intervenors Sotherly Hotels, Inc., and Capitol Hotel Associates, L.P., L.L.P.,[2] (collectively, "Appellants") argue that the trial court erred in denying their Motion in the Cause to hold the City of Wilmington ("Wilmington") in contempt for allegedly violating the 2006 Consent *642 Judgment Wilmington entered into with Wells prohibiting the use of public funds to subsidize a privately owned hotel as part of Wilmington's broader plan to build a convention center complex in downtown Wilmington. Appellants contend that the trial court erred in its conclusion that the land for the hotel site was beyond the scope of the Consent Judgment. Appellants also argue that the trial court erred in concluding that Wilmington's plan to sell the hotel site to a private developer does not subsidize or underwrite the hotel; that Wilmington properly used its authority under section 158-7.1(d) of our General Statutes in setting the hotel site's fair market value; and that Wilmington's proposed Garage Parking License Agreement does not violate the Consent Judgment. After careful consideration, we affirm the trial court's order.
I. Facts and Procedural History
For more than 15 years, Wilmington has been working to build a downtown convention center complex including a convention center, parking deck, and hotel. In 2005, citing North Carolina's Local Development statute, N.C. Gen.Stat. § 158-7.1, Wilmington passed a resolution to authorize the purchase of a 7.8-acre tract of land for $3,803,500.00 to serve as the site for this complex. The hotel was to occupy 33,000 square feet of this tract, and the cost of the land for the hotel's pro rata share of the larger tract's acquisition cost was $311,539.00.
On 13 October 2005, Wells and three local hotel operators filed suit in New Hanover County Superior Court seeking a declaratory judgment against Wilmington, New Hanover County, and the New Hanover County Tourism *358 Development Authority. Wells and the hotel operators asserted that Wilmington's planned use of occupancy tax proceeds was improper and amounted to an unconstitutional conveyance of public funds as gifts and benefits to the private developer that Wilmington had entered into an agreement with to develop, construct, and operate the convention center, parking deck, and hotel. This lawsuit was resolved by a Consent Judgment Resolving All Claims ("Consent Judgment") entered on 8 August 2006 by New Hanover County Superior Court Judge Paul L. Jones. The Consent Judgment provided in pertinent part that:
Any plans by [Wilmington] to construct a public convention center with adjacent parking facilities ("the Convention Center") in conjunction with an adjoining privately owned hotel ("the Hotel") (collectively "Convention Center Project") within the area now designated as "Downtown Wilmington" ... shall conform to the following requirements:
*643 ...
(b) All Convention Center facilities and parking shall be available to all users on the same terms, conditions and prices pursuant to policies, procedures and price schedules established and monitored by the City of Wilmington.
(c) No public funds of any nature shall be used to acquire, build, equip, operate or otherwise underwrite or subsidize the Hotel or its operations (including shared facilities) except as permitted in paragraph (d) below....
Since 2006, Wilmington has issued four Requests for Qualifications ("RFQ") in an effort to secure a developer to build and operate the hotel. Each of these RFQs provided that any potential developer must pay fair market value for the hotel site and either expressly stated that Wilmington would not contribute any funding to the hotel's construction or subsidize the hotel in any way, or else included the Consent Judgment as an attachment. In 2007, Wilmington obtained a Summary Appraisal Report from Ingram & Company, Inc., which concluded that the fair market value of the hotel site as of 12 October 2007 was $475,000.00, equivalent to roughly $17.54 per square foot. By November 2010, Wilmington had completed construction of the convention center and adjacent parking garage but had been unable to reach an agreement with any private developer to construct and operate the hotel.
On 7 February 2012, in conjunction with its fourth RFQ, Wilmington's City Council passed a Resolution Authorizing the Execution of a Memorandum of Understanding with Harmony Hospitality, Inc. ("Harmony"), which provided for "the eventual sale of City-owned real property adjacent to the Downtown Convention Center for the construction of a privately funded hotel." On 4 February 2014, after two years of negotiating with Harmony, Wilmington's City Council passed a Resolution Approving the Sale of Land Pursuant to the Terms of a Purchase and Development Agreement ("the Resolution"). That agreement provided that Wilmington would convey the hotel site to Harmony for a purchase price of $578,820.00, which the Resolution found
pursuant to North Carolina General Statutes Section 158-7.1(d), ... reflects the value of the Property in consideration of the probable average hourly wage to be paid, the fair market value of the interest and the covenants, conditions and restrictions imposed on the Property, the prospective tax revenues from the Hotel to be constructed *644 on the Property, prospective sales tax revenues to be generated in and around the City, as well as any other prospective tax revenues and income coming to the City over the next ten (10) years as a result of the conveyance[.]
The Resolution concluded that "[t]he fair market value of the Property when subject to the covenants, conditions and restrictions of the City is $578,820.00" and that "[t]he conveyance complies with NCGS Section 158-7.1 and the Consent Judgment." On 5 February 2014, Wilmington entered into a Purchase and Development Agreement with Harmony, which provided that the hotel would be eight stories in height and have 186 guest room suites and 6,000 square feet of conference and banquet spaces, as well as a full-service restaurant and lounge. As an attachment to that agreement, the parties also negotiated a *359 Garage Parking License Agreement, under which Wilmington agreed to reserve 250 parking spaces on the first three floors of the parking deck that adjoins the Convention Center for Harmony's use for an initial 30-year term, with options to renew for two additional 10-year terms, for $300,000.00 per year for the first five years with escalations in rates thereafter.
In September 2013, during the course of its negotiations with Harmony and as part of its normal practices, Wilmington received a second Summary Appraisal Report ("the 2013 Appraisal") of the hotel site by Ingram & Company, Inc. The 2013 Appraisal was undertaken by Hector Ingram and concluded that the hotel site's fair market value as of 25 September 2013 was $1,320,000.00, subject to the Extraordinary Assumption "that the subject tract is not adversely affected by any easements or agreements, other than the one restricting its use to a hotel." Ingram's 2013 Appraisal also cautioned that "it should be noted that the City has had great difficulty in locating a developer to build a hotel on the subject site[,] pointing, in my opinion, to the marginal feasibility of the overall project." In any event, Wilmington did not use this 2013 Appraisal in its ongoing negotiations with Harmony, which had begun and were proceeding based on the fourth RFQ and the previous fair market valuation of the hotel site at $475,000.00.
On 28 February 2014, after Wilmington had announced its Purchase and Development Agreement with Harmony, Wells filed a motion in New Hanover County Superior Court to show cause why Wilmington should not be held in contempt for its alleged failure to comply with the Consent Judgment. On 12 March 2014, Sotherly Hotels, Inc., and Capitol Hotel Associates, L.P., L.L.P., moved to intervene in this matter. The Intervenors own and operate the Hilton Wilmington Riverside hotel in downtown Wilmington, and although they were never parties to *645 Wells' original lawsuit or the resulting Consent Judgment, they object to both the amount Wilmington will receive for the sale of the hotel site and the Garage Parking License Agreement it entered into with Harmony. The trial court entered an order permitting their intervention on 14 April 2014, and the parties thereafter entered into a consent scheduling order and conducted discovery on an expedited basis.
During discovery, Ingram was deposed by Wells and the Intervenors, and also provided an affidavit for Wilmington, regarding the validity of his 2013 Appraisal. Ingram explained that his Extraordinary Assumption that "the subject tract is not adversely affected by any easements or agreements, other than the one restricting its use to a hotel" was "a key part of my Report," and that "[i]f the facts turn out to be different than the Extraordinary Assumption, that could affect my opinion in value." Ingram also stated that he did not attempt "to analyze or value the Purchase and Development Agreement itself" because "[t]hat is beyond my expertise," and that, when he undertook his 2013 Appraisal, he
did not have cost estimates as to (a) non-standard configurations of the [hotel] due to the land configurations, (b) zero-lot line costs, (c) fire and structural costs due to the eight-story height, (d) construction costs associated with Brownsfields' [sic] issues, (e) vehicular access over the Chamber of Commerce property, [and] (f) the Fire Department required access to [the] riverwalk. If I had known these items, and their associated above normal costs, I would likely have adjusted for them in my valuation analysis.
Finally, Ingram explained that, "[b]ecause this site is so awkward to develop because of the shape of it and the size of it and the under-performing Convention Center, I still think that this is a very marginally feasible project, and I would not put my money into it."
The matter came on for hearing before Judge Paul L. Jones on 29 May 2014. On 10 June 2014, the trial court entered an Order Denying Motion in the Cause ("the Order"). In its Order, the trial court found as facts that:
• the land for the hotel site was not discussed during the negotiations that resulted in the Consent Judgment because it "had already been acquired by Wilmington *360 and had not been purchased with room occupancy taxes"; *646 • Wilmington had originally purchased the land for the hotel site for $311,539.00 and sought to sell it to Harmony for $578,820.00 at a profit of $267,521.00[3] ;
• although the land for the hotel site "currently generates no revenue for Wilmington, not even property taxes," under the Purchase and Development Agreement, the city stood to receive direct net revenues of $6,483,347.00 from occupancy taxes, parking revenues, and property taxes over the next ten years with additional revenues to follow;
• in light of the site's "size, configuration, restrictions and agreements which are in place," the costs of developing and building a hotel on the land were more than $2,300,000.00 higher than the normal expenses associated with building a hotel in a typical urban location;
• as stated in his affidavit dated 14 May 2014 regarding his 2013 Appraisal, Ingram did not review the Purchase and Development Agreement or the additional construction costs associated with the hotel site when he undertook his 2013 Appraisal because those matters were beyond his expertise, but this information certainly would have affected his valuation if he had considered it and, in any event, Ingram believed that the hotel project was marginally feasible; and
• the same rates and terms that Wilmington and Harmony negotiated in their Garage Parking License Agreement would be "available to other members of the public in Wilmington, including Intervenors."
Based on these findings, the trial court concluded as a matter of law that:
• the Consent Judgment "does not place restrictions on the sale of the land for the hotel because the 'Hotel' was defined as planned to be constructed in conjunction with the Convention Center and an adjacent parking facility," which means that "[t]he land for the hotel is *647 not included in the definition of the 'Hotel' or the scope of the Consent Judgment";
• given the $267,281.00 profit Wilmington stands to make on the sale of the land for the hotel site under the Purchase and Development Agreement, as well as roughly $6,483,347.00 in expected future revenues, Wilmington is not subsidizing or underwriting the hotel;
• Wilmington acted within its authority under section 158-7.1(d) of our General Statutes when it set the land's fair market value price at $578,820.00;
• the Extraordinary Assumptions on which Ingram based his 2013 Appraisal "have turned out not to be correct"; and
• the Garage Parking License Agreement complies with the Consent Judgment and does not subsidize or underwrite the hotel.
Given these findings of fact and conclusions of law, the trial court denied Wells' and the Intervenors' Motion in the Cause. On 20 June 2014, Wells gave notice of appeal to this Court. On 27 June 2014, the Intervenors also gave notice of appeal to this Court.
II. Analysis
A. Scope of Consent Judgment
Appellants argue first that the trial court erred in its conclusion of law that the Consent Judgment does not apply to the land for the hotel site. We disagree.
As this Court has previously recognized, when reviewing a trial court's interpretation of a consent judgment,
[t]he general rule is that a consent judgment is the contract of the parties entered upon the record with the sanction of the court. The consent judgment is a contractual agreement and its meaning is to be gathered from the terms used therein, and the judgment should not be extended beyond *361 the clear import of such terms. However, to interpret the nature and import of the consent judgment more precisely, courts are not bound by the four corners of the instrument itself. The agreement, usually reflecting the intricate course of events surrounding the particular *648 litigation, also should be interpreted in the light of the controversy and the purposes intended to be accomplished by it.
Where the plain language of a consent judgment is clear, the original intention of the parties is inferred from its words. The trial court's determination of original intent is a question of fact. On appeal, a trial court's findings of fact have the force of a jury verdict and are conclusive if supported by competent evidence. The trial court's determination of whether the language in a consent judgment is ambiguous, however, is a question of law and therefore our review of that determination is de novo.
Handy Sanitary Dist. v. Badin Shores Resort Owners Ass'n, Inc., 225 N.C.App. 296, 298-99, 737 S.E.2d 795, 798 (2013) (citation omitted). In the present case, Appellants contend that the Consent Judgment's plain language unambiguously provides a broad prohibition against "any plan" by Wilmington to use public funds to underwrite or subsidize the hotel and therefore applies to all future proposed hotel-related transactions. Appellants argue further that Wilmington's implicit and explicit references to the Consent Judgment in its RFQs and other public disclosures pertaining to the Convention Center project confirm this interpretation.
Appellants' argument fails for these reasons. First, as a general matter, it is well established in North Carolina that restrictions on the alienation or sale of real property "are strictly construed in favor of the free use of land whenever strict construction does not contradict the plain and obvious purpose of the contracting parties." Armstrong v. Ledges Homeowners Ass'n, 360 N.C. 547, 555, 633 S.E.2d 78, 85 (2006) (citations and emphasis omitted). Here, the Consent Judgment's express terms do not restrict or even reference the land for the hotel site. Instead, the Consent Judgment's plain language defines its scope as applying to "[a]ny plans ... to construct a public Convention Center with adjacent parking facilities ('the Convention Center') in conjunction with an adjoining privately owned hotel ('the Hotel') (collectively 'Convention Center Project') within ... Downtown Wilmington," and prohibits Wilmington from using "public funds of any nature ... to acquire, build, equip, operate or otherwise underwrite or subsidize the Hotel or its operations[.]" The omission of any reference to the land for the hotel site is unsurprising in light of the trial court's unchallenged findings of fact that "the land for the hotel site was not discussed" when the Consent Judgment was negotiated because "[t]he land was not part of the dispute in the prior lawsuit [.]" Indeed, Wilmington had already purchased *649 the land before Wells filed his original lawsuit, which was aimed at preventing Wilmington from spending room occupancy tax revenues to assist a private developer in constructing a hotel in conjunction with the Convention Center, and we construe the Consent Judgment's plain language accordingly. Although Appellants urge this Court to expand the Consent Judgment's scope beyond its express terms to cover the land for the hotel and all future proposed hotel-related transactions, our prior decisions demonstrate that when a consent judgment's plain language is clear, we infer the parties' intentions from its words rather than from additional terms that one party subsequently seeks to add. See, e.g., Handy Sanitary Dist., 225 N.C.App. at 298-99, 737 S.E.2d at 798 ; see also Walton v. City of Raleigh, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) (declining appellants' request to read "something more" into a consent judgment's unambiguous terms because "[w]e are governed by the plain words of the consent judgment"). Consequently, we hold that the trial court did not err in concluding that the sale of the land is beyond the Consent Judgment's scope.
B. Wilmington's agreement with Harmony does not underwrite or subsidize the hotel
Appellants argue next that the trial court erred in its conclusions that "Wilmington is not subsidizing or underwriting the *362 hotel development" and that the Purchase and Development Agreement does not violate the terms of the Consent Judgment. We disagree.
The standard of review on appeal from a judgment entered after a non-jury trial is "whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." Pegg v. Jones, 187 N.C.App. 355, 358, 653 S.E.2d 229, 231 (2007) (citations and internal quotation marks omitted), affirmed per curiam, 362 N.C. 343, 661 S.E.2d 732 (2008). When the trial court's factual findings are supported by competent evidence, they are considered conclusive. See id. We review the trial court's conclusions of law de novo. See Carolina Power & Light Co. v. City of Asheville, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004).
In the present case, Appellants contend that the trial court's conclusions are premised on findings of fact that are not supported by competent evidence. Specifically, Appellants argue that the trial court's finding that Wilmington stood to make a profit of $267,281.00 by selling the land for the hotel site to Harmony for $578,820.00 after purchasing it for $311,539.00 is fatally undermined by Ingram's 2013 Appraisal of the land's fair market value at $1,320,000.00. Thus, Appellants argue that *650 the proposed sale price under the Purchase and Development Agreement amounts to a subsidy from Wilmington to Harmony of $741,180.00, which flagrantly violates the Consent Judgment's unambiguous prohibition against using any public funds to underwrite or subsidize the hotel.
Appellants acknowledge that their argument on this point depends on the accuracy of Ingram's 2013 Appraisal, which Ingram himself subsequently admitted did not factor in the terms of the Purchase and Development Agreement or the additional $2,300,000.00 in construction costs associated with the hotel site due to its small size and awkward shape. Appellants nevertheless argue that the trial court erred in rejecting Ingram's 2013 Appraisal, which the court concluded "relates only to the hotel land and not the other benefits to Wilmington from the Purchase and Development Agreement" and "is based on certain Extraordinary Assumptions, which have turned out not to be correct." In support of this argument, Appellants assert that the trial court's conclusion of law does not explicitly identify which Extraordinary Assumption proved incorrect and they also highlight selective quotations from Ingram's 2013 Appraisal that, when read out of context, appear to undermine the trial court's findings that Ingram's fair market valuation would have been different if he had considered the Agreement's terms and the additional construction costs associated with the hotel site.
We find these arguments wholly unpersuasive. On the one hand, although Appellants are technically correct that the trial court's conclusion does not explicitly state which of Ingram's Extraordinary Assumptions were incorrect, its factual findings-which are based on Ingram's subsequent deposition and affidavit-make absolutely clear that the Extraordinary Assumption in question was that "the subject tract is not adversely [a]ffected by any easements or agreements, other than the one restricting its use to a hotel." Similarly, while Appellants are technically correct that portions of Ingram's 2013 Appraisal identify the same concerns that the trial court cited in its factual findings to support its legal conclusion that Ingram's Extraordinary Assumption proved incorrect, this does not mean, as Appellants imply, that the trial court erred. Appellants' argument here fundamentally misconstrues the function of an Extraordinary Assumption. As Ingram's 2013 Appraisal makes clear:
An extraordinary assumption is an assumption, directly related to a specific assignment, which if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic *651 characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about integrity of data used in the analysis.
Essentially then, although Ingram's 2013 Appraisal did indeed note concerns about feasibility, restrictions on the land, and potentially *363 higher than ordinary construction costs due to the hotel site's condition, Ingram's Extraordinary Assumption served as a disclaimer to caution readers that these concerns exist but were not taken into account in calculating the hotel site's fair market value. Moreover, in his affidavit, Ingram confirmed that his Extraordinary Assumption regarding the adverse effects of easements and agreements was a key part of his report, that he did not analyze or value the Purchase and Development Agreement itself, that he did not factor in the additional construction costs associated with the hotel site, and that he believed the project was so marginally feasible he would not put his own money into it.
We conclude that Ingram's deposition and affidavit constitute competent evidence that supports the trial court's factual findings, which in turn support its legal conclusions that Ingram's 2013 Appraisal "related only to the hotel land" and that the Extraordinary Assumption on which Ingram's 2013 Appraisal was based was incorrect. We therefore have no trouble in concluding further that the trial court did not err in rejecting Ingram's 2013 Appraisal. Thus, given that Wilmington is selling the land for $578,820.00 and stands to make a profit on its original purchase of $267,281.00, we hold that the trial court did not err in concluding that the Purchase and Development Agreement does not violate the Consent Judgment because Wilmington is not subsidizing or underwriting the hotel.
C. Fair market value under section 158-7.1(d)
Appellants argue next that the trial court erred in concluding that Wilmington had the authority under section 158-7.1(d) of our General Statutes to set the fair market value of the hotel site at $578,820.00 in light of "the obligations placed on [Harmony] under the Purchase and Development Agreement as well as greater than normal costs to develop this site." We disagree.
We review questions of statutory interpretation de novo. See, e.g., Price & Price Mech. of N.C., Inc. v. Miken Corp., 191 N.C.App. 177, 179, 661 S.E.2d 775, 777 (2008).
Section 158-7.1(d) of our General Statutes provides that a local government "shall determine ... the fair market value" of the property it *652 seeks to convey, while subsection (d2) allows a local government to take prospective revenues into account when "arriving at the amount of consideration that it receives" for that property. N.C. Gen.Stat. § 158-7.1(d), (d2) (2013). Here, as the trial court noted in its findings of fact, Wilmington's City Council passed a Resolution stating that the sale price of $578,820.00
reflects the fair market value of that real property interest given the covenants, conditions, and restrictions imposed, the prospective tax revenues from the hotel to be constructed, prospective sales tax revenue to be generated for Wilmington as well as other prospective tax revenues and income coming to Wilmington over the next ten years as a result of the conveyance.
Appellants object that the City Council's Resolution improperly conflated the hotel site's fair market value with the consideration Wilmington will receive in order to artificially lower the hotel site's value to match Harmony's offer. However, this entire argument presupposes that the hotel site's fair market value is $1,320,000.00 and that the trial court erred in rejecting Ingram's 2013 Appraisal. As the preceding discussion makes clear, Appellants' premise is erroneous, which means this argument is without merit. Accordingly, we hold that the trial court did not err in its conclusion that Wilmington acted within its authority under section 158-7.1(d).
D. The Garage Parking License Agreement does not violate the Consent Judgment
Finally, Appellants argue that the trial court erred in concluding that the Garage Parking License Agreement complies with section (b) of the Consent Judgment and does not underwrite or subsidize the hotel as prohibited by section (c). We disagree.
Section (b) of the Consent Judgment provides that "[a]ll Convention Center facilities and parking shall be available to all users on the same terms, conditions and prices pursuant to policies, procedures and price schedules *364 established and monitored by the City of Wilmington." In its Order, the trial court found as facts that "[t]he hotel will license reserved parking spaces on the same terms, conditions, and prices pursuant to policies, procedures and price schedules established and monitored by Wilmington, that are available to other members of the public in Wilmington, including Intervenors," and that "[t]he bulk long-term term and rates are available to other users in Wilmington at the decks owned by Wilmington including the Convention Center deck." *653 Appellants nevertheless object that the Garage Parking License Agreement violates section (b) of the Consent Judgment because it will leave inadequate capacity for other users, such as the Intervenors, to provide guaranteed convention center parking to their guests. This argument fails, however, because nothing in section (b), or any other part of the Consent Judgment, requires Wilmington to make "guaranteed convention center parking" available to other area hotels, nor does its plain language bar Wilmington from entering into this type of parking arrangement so long as the terms, conditions, and prices are the same as those available to the general public. Moreover, the trial court's findings of fact on this issue are supported by competent evidence, including an affidavit dated 21 May 2014 from Wilmington's Finance Director Debra H. Mack, who stated that under the Garage Parking License Agreement, which is for an initial term of 30 years with options for two 10-year extensions, Wilmington will reserve 250 spaces for Harmony's use in the parking garage that adjoins the Convention Center "on the same basis and terms that are available to other members of the public in Wilmington. The same rental rate is available for the Water Street Deck across the street from the Hilton, so that the Hilton is getting the exact same treatment as what [Harmony] will have." We therefore conclude that the trial court did not err in its conclusion that the Garage Parking License Agreement does not violate section (b) of the Consent Judgment.
Appellants also argue that the trial court erred in concluding that the Garage Parking License Agreement "does not subsidize [or] underwrite the planned hotel given the escalating rates to be charged during its 30-year term." By Appellants' logic, the agreement violates section (c) of the Consent Judgment because it amounts to a subsidy for Harmony insofar as it will save approximately $3,750,000.00 by not having to build its own parking garage. Appellants argue further that although the trial court found as a fact that under the agreement "Wilmington is guaranteed to receive $300,000.00 a year for the first five years, with escalations in rates thereafter," this rate still amounts to a subsidy for Harmony because if it had to borrow $3,750,000.00 over a 10-year term at 5% interest in order to construct its own parking garage, it would have to pay at least $125,000.00 more in debt-servicing expenses than it must pay Wilmington annually under the agreement.
We are not persuaded. Although section (c) of the Consent Judgment broadly prohibits Wilmington from using public funds "to acquire, build, equip, operate or otherwise underwrite or subsidize the Hotel or its operations," its plain language neither references nor restricts the Convention Center's parking deck. It is important to remember here, *654 as Appellants once again urge this Court to expand section (c) beyond its express terms, that the purpose of the original lawsuit, and the aim of the resulting Consent Judgment, was to prevent Wilmington from spending room occupancy tax revenues or other public funds to help construct a private hotel. Nothing in the Consent Judgment provides any support for the notion that it was drafted for the benefit of parties like these Intervenors, who were never joined in the original action but would presumably stand to benefit from not having to compete with another hotel in Downtown Wilmington if the city could somehow be blocked from ever reaching any deal to sell the hotel site. Nevertheless, the Consent Judgment's plain language makes clear that this was not the parties' intent. We therefore hold that the trial court did not err in concluding that the Garage Parking License Agreement does not violate section (c) of the Consent Judgment's prohibition against Wilmington subsidizing *365 the hotel. Accordingly, the trial court's order is
AFFIRMED.
Judges STEELMAN and McCULLOUGH concur.

Although the trial court's Order Denying Motion in the Cause refers to the second intervening party as "Capital Hotel Associates, L.P., L.L.P.," throughout this opinion we adopt the spelling provided in Capitol's motion to intervene, to wit, "Capitol Hotel Associates, L.P., L.L.P."

Based on our review, it appears that the trial court erred slightly in its calculations of the profits that Wilmington will realize from this sale, given that the difference between the purchase price Harmony will pay for the land and the price Wilmington originally paid for it actually amounts to $267,281.00. While this error has no effect on our analysis, for the sake of mathematical accuracy we utilize the correct total throughout this opinion.